

# COURT OF APPEALS

## SECOND DISTRICT OF TEXAS
## FORT WORTH

**NO. 2-08-360-CR**

FREDERICK DEWAYNE                                    APPELLANT
MALONE A/K/A FREDERCK
DEWANGE MALONE

V.

THE STATE OF TEXAS                                        STATE

------------

FROM THE 396TH DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

A jury convicted Appellant Frederick Dewayne Malone a/k/a Frederck Dewange Malone of capital murder, and, the State having waived the death penalty option, he received an automatic life sentence. In five points, Appellant contends that the evidence is legally and factually insufficient to support his conviction and complains about the admission of his oral confession and the State's closing

---

[1] See Tex. R. App. P. 47.4.

argument at the guilt-innocence phase. Because we hold that the evidence is legally and factually sufficient to support Appellant's conviction and that the trial court did not err, we affirm the trial court's judgment.

**Facts**

Mrs. Eloida Marin testified that on December 21, 2006, she and her husband, Antonio, arrived in Fort Worth to visit with their son, Ruben, and his family. On December 30, after 8:00 p.m., Mrs. Marin, Antonio, Ruben, and Ruben's two children were sitting in the living room when Mrs. Marin heard a knock on the door. Ruben got up to answer the door. He did not see anyone through the peephole. He opened the door about six inches, and then two young African-Americans slammed it open and forced him to the floor. Mrs. Marin described the men as each having "a little bit of beard" and stated that one was tall and the other one was short. She clarified her earlier testimony about the two men slamming the door open, explaining that the short one had come in first and had taken Ruben to the ground. The tall one had pointed a gun at her husband and her. By this time, she and her husband had stood up. Mrs. Marin testified that the first shot occurred when the short man shot Ruben; the tall man was pointing his gun at her husband and her. Her husband moved to help Ruben, and then the tall man shot her husband. But neither Mrs. Marin nor her husband realized that he had been shot until the paramedics had removed Ruben from the apartment. The paramedics took both men to the hospital, where Antonio later died.

2

Mrs. Marin testified that she did not identify the two intruders from a photo spread. In court, she tentatively identified Appellant as the person who had shot her husband, stating that she was not sure.

On cross-examination, Mrs. Marin indicated that she had initially told the police that the short person had shot both her husband and her son. She also admitted when asked, "And do you remember indicating or telling Ms. Reyes that you thought maybe the tall one shot your husband, but then you later told Ms. Reyes that you didn't see who shot your husband because you were nervous and your eyes were on your son?", that "[she] always ha[d] said that, [but had] recalled very well that the taller one shot [her] husband."

Ruben Marin testified that on December 30, he arrived home about 8:00 or 8:30 p.m. He had more than $1,000 in his wallet. He was sitting on the love seat close to the front door, talking with his parents and children, when he heard a knock on the door. He looked through the peephole and saw an unfamiliar African-American man. Ruben then opened the front door about three or four inches to see what the stranger wanted. The stranger tried to get into the apartment. Ruben tried to close the door, but the stranger put his foot down and wedged his hand in to prevent the door from closing. Ruben recalled that the stranger had a medium-sized black revolver in his hand. Ruben tried to take the gun away from the stranger. Ruben testified that they struggled for the gun but that he let go when he realized that his children were nearby. Ruben testified that during the struggle, he noticed

3

that another unfamiliar African-American man had come in and had moved toward his parents. Ruben testified that the second man had a silver gun, like a square, and that the second man pointed the gun at the elderly Marins. Ruben testified that when the second man came in, the first man shot Ruben in the side. The first man then ripped Ruben's left pocket, removing a magazine, and took Ruben's wallet from his right pocket. Ruben's dad moved closer to Ruben to help him, and then Ruben heard but did not see another shot. The second intruder was beside Ruben's dad, and the first intruder was still behind Ruben, near the front door, when Ruben heard the shot. Ruben testified that the second man was taller than the first, with a fuller face, and that the second man had a shaved head.

Detective Billy W. Randolph testified that a few days after the Marin robbery, he began to suspect Desmond Brooks, a resident of Ruben Marin's apartment complex who had committed a robbery earlier in December. Detective Randolph testified that Desmond Brooks was about five feet, six inches tall or five feet, seven inches tall and weighed about 160 pounds. Detective Jose Hernandez testified that Brooks was five feet, seven inches tall and weighed 140 pounds. The police arrested Brooks on outstanding warrants and interviewed him for several hours. Detective Randolph testified that during the Brooks interview, Appellant's name came up (the detective testified that Brooks said that Appellant was his next-door neighbor), and Brooks also told the police where to find evidence of the Marin robbery.

Officer Bill Yeager testified that he participated in the search of Apartment 229 at Ruben's apartment complex and collected two weapons, ammunition, and personal effects. Relying on information gleaned from the Brooks interview, the police found one of the weapons, a firearm, in a sock in a laundry basket in the bedroom closet. Officer Yeager also found a wallet in the air conditioning unit. At trial, Detective John Livesay identified the firearm found in the sock, State's Exhibit 37, as a .22 caliber revolver, and he identified the wallet as Ruben's.

Detective Livesay searched the car of Brooks's girlfriend. He found receipts showing that Appellant rented Apartment 228, the apartment next to Brooks's, which Detective Livesay confirmed with the apartment's management. Officer Yeager also searched Apartment 228.

Appellant was subsequently arrested for the Marin robbery in Austin County. Detectives Hernandez, Livesay, and Randolph went to that county to interview Appellant, who Randolph testified was about six feet, two inches tall and weighed about 175 pounds. All three detectives identified Appellant at trial. During the interview, which was recorded, Appellant admitted to knowing that his cousin, Brooks, was going to rob someone, agreeing to be Brooks's driver, entering the apartment with a gun at his side, and ushering the two wounded men and the elderly woman into the bathroom after the robbery and shootings. He denied shooting anyone and claimed that he had purchased the .22 recovered upon his arrest from Brooks after the robbery. He also stated that he was a psychopath, saw a

psychiatrist, and was on Trazadone and Restidol. The interview took place in the wee hours of the morning, and Appellant yawned occasionally during the two–three hour interview.

After the interview, Detective Randolph took custody of Appellant's possessions and personal effects with which he had been arrested, including a pistol that was sealed in a bag. Detective Randolph did not open the bag. Detective Livesay testified that the pistol recovered from Appellant was a .22 caliber.

In comparing the .22 caliber pistol found at Brooks's apartment and the .22 caliber pistol recovered when Appellant was arrested, Detective Livesay testified that Appellant's gun had a longer barrel (four inches) and a nine-shot capacity. The revolver found in Brooks's apartment had about a two-and-a-half-inch barrel. Michael Ward, senior forensic scientist in the firearms and tool mark unit of the Fort Worth Police Department's crime laboratory, testified that the bullet recovered from the elder Mr. Marin's body, State's Exhibit 31C, had been fired from State's Exhibit 52, the .22 seized upon Appellant's arrest. Ward also testified that the same bullet was not fired from State's Exhibit 50, the .22 retrieved from Brooks's apartment.

A jailhouse informant also testified that Appellant admitted to participating in the crime, but the informant's report of some of the details of the offense, such as the location of the bullet wounds on the Marin men, differed from the forensic evidence admitted at trial.

6

## Legal and Factual Sufficiency

In his first point, Appellant challenges the legal sufficiency of the evidence supporting his conviction. The indictment alleges that Appellant intentionally caused the death of Antonio Marin by shooting him with a firearm in the course of committing or attempting to commit the offense of robbery of Antonio Marin or Ruben Marin. The jury charge includes a charge on the law of parties.

Section 19.03(a) of the penal code provides in relevant part that "[a] person commits [capital murder] if the person commits murder as defined under Section 19.02(b)(1) and . . . the person intentionally commits the murder in the course of committing or attempting to commit . . . robbery."[2] Section 19.02(b)(1) of the penal code provides that a person commits murder if he "intentionally or knowingly causes the death of an individual."[3] Section 29.02 of the penal code provides in relevant part that a person commits robbery "if, in the course of committing theft . . . and with intent to obtain or maintain control of the property, he . . . intentionally, knowingly, or recklessly causes bodily injury to another."[4]

Appellant contends that Brooks committed the offense and that he was just Brooks's pawn and has always maintained his innocence. But Appellant's own statement is evidence that at a minimum, he agreed to be the getaway driver and

---

[2] Tex. Penal Code Ann. § 19.03(a) (Vernon Supp. 2009).

[3] *Id.* § 19.02(b)(1) (Vernon 2003).

[4] *Id.* § 29.02(a)(1).

then escalated his participation by entering the apartment carrying a loaded gun and by ushering the adult Marins into the bathroom after the robbery and shootings. Applying the appropriate standard of review,[5] we hold that the evidence is legally sufficient to support Appellant's conviction for capital murder. We overrule Appellant's first point.

In his second point, Appellant contends that the evidence is factually insufficient to support his conviction for capital murder. Again, though, his own statement provides evidence of his culpability in the offense, as does the ballistics match of the bullet taken from the elder Marin's body and the .22 seized upon Appellant's arrest. Applying the appropriate standard of review,[6] we hold that the evidence is factually sufficient to support Appellant's conviction for capital murder. We overrule his second point.

### Appellant's Confession

In his third point, Appellant contends that the trial court erred by denying his motion to suppress his oral statement taken in violation of article 38.22 of the code of criminal procedure, claiming that he did not understand the warnings under article

---

[5] *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (both providing standard for reviewing the legal sufficiency of the evidence).

[6] *See Steadman v. State*, 280 S.W.3d 242, 246–47 (Tex. Crim. App. 2009); *Lancon v. State*, 253 S.W.3d 699, 704 (Tex. Crim. App. 2008); *Watson v. State*, 204 S.W.3d 404, 414–15, 417 (Tex. Crim. App. 2006); *Johnson v. State*, 23 S.W.3d 1, 8–9, 12 (Tex. Crim. App. 2000) (all providing standard for reviewing the factual sufficiency of the evidence).

38.22, that he would not have given a statement had he understood that he could terminate the interview, that he was on medication that prohibited him from understanding the interview process, and that his will was overborne. He also contends that "[t]he officer used a method to induce . . . [him] to give a statement that was in violation of the due process clause of the State and Federal Constitutions" and that the statement was involuntary, violating Article 38.21.

Article 38.21 of the code of criminal procedure provides that "[a] statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion, under the rules hereafter prescribed."[7] Article 38.22, section three of the code of criminal procedure provides,

> (a) No oral . . . statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless:
>
> (1) an electronic recording, which may include motion picture, video tape, or other visual recording, is made of the statement;
>
> (2) prior to the statement but during the recording the accused is given the warning in Subsection (a) of Section 2 above and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning;
>
> (3) the recording device was capable of making an accurate recording, the operator was competent, and the recording is accurate and has not been altered;
>
> (4) all voices on the recording are identified; and

---

[7] Tex. Code Crim. Proc. Ann. art. 38.21 (Vernon 2005).

(5) not later than the 20th day before the date of the proceeding, the attorney representing the defendant is provided with a true, complete, and accurate copy of all recordings of the defendant made under this article.

(b) Every electronic recording of any statement made by an accused during a custodial interrogation must be preserved until such time as the defendant's conviction for any offense relating thereto is final, all direct appeals therefrom are exhausted, or the prosecution of such offenses is barred by law.

. . . .

(e) The courts of this state shall strictly construe Subsection (a) of this section and may not interpret Subsection (a) as making admissible a statement unless all requirements of the subsection have been satisfied by the state, except that:

(1) only voices that are material are identified; and

(2) the accused was given the warning in Subsection (a) of Section 2 above or its fully effective equivalent.[8]

Appellant does not provide any specific arguments or analysis to support his contentions, nor does he point to any specific violations of these statutes.

The trial court found that

• Appellant was "advised of the statutory warnings as required by Article 38.22 . . . [and that he] freely, voluntarily, intelligently, and knowingly waived those rights and agreed to answer questions";

• Appellant never requested to have a lawyer present or to terminate the interview;

• "the Court was not convinced that [Appellant's yawning] had anything to do with any type of inability to comprehend what was going on"; and

---

[8] *Id.* art. 38.22.

10

- Appellant "was lucid throughout the interview and was able to address and to answer questions or respond in an appropriate manner to the questions."

The trial court concluded as a matter of law that all the requirements of article 38.22 had been met.

Our review of Appellant's statements shows that it was taken in compliance with articles 38.21 and 38.22 as well as the state and federal constitutions. Appellant was Mirandized, and his statement was recorded. All speakers were identified. Appellant told the questioning officers that he was on Trazadone and Restidol, that he was a psychopath, that he saw a psychiatrist, and that the medicine helped him relax. He also yawned occasionally during the interview, which was taken in the early morning hours. But nothing in our review of his statement, or the other evidence in the record, for that matter, raises an issue of any incompetence of Appellant or any failure by him to understand the interview proceedings.[9] Further, while we note that the officers used permissible trickery, deceit, and other persuasive techniques in their questioning of defendant, our review of the recorded interview does not show that any of their actions appear calculated to produce an untruthful confession or one that is offensive to due process,[10] and Appellant does not otherwise point to any such actions. We cannot conclude that his will was

---

[9] *See Lucas v. State*, 791 S.W.2d 35, 62 (Tex. Crim. App. 1989).

[10] *See Creager v. State*, 952 S.W.2d 852, 856 (Tex. Crim. App. 1997).

11

overborne.[11]  Based on the applicable standard of review,[12] we hold that the trial

court properly denied Appellant's motion to suppress.  We overrule Appellant's third

point.

In his fourth point, Appellant contends that the trial court abused its discretion

by overruling his rule 403 objection to the admission of his oral statement.  Rule 403

provides that "[a]lthough relevant, evidence may be excluded if its probative value

is substantially outweighed by the danger of unfair prejudice, confusion of the issues,

or misleading the jury, or by considerations of undue delay, or needless presentation

of cumulative evidence."[13]  A trial court is not required to perform a balancing test in

a formal hearing on the record.[14]  Given the inability of the Marins to positively

identify Appellant as one of the robbers and the risk that the jailhouse informant's

mangling of some of the details of the offense as compared to the forensic testimony

could have made him appear less than credible to the jury, as could the fact that he

was allowed to plead to a lesser offense in an unrelated case in exchange for his

testimony against Appellant, Appellant's statement was highly probative and was

---

[11] See *id.*

[12] *See Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).

[13] *See* Tex. R. Evid. 403.

[14] *Williams v. State*, 958 S.W.2d 186, 195–96 (Tex. Crim. App. 1997).

12

crucial to the State's case. Further, as we held above, Appellant does not point to any improper actions by the officers in taking his statement. Accordingly, the trial court could have properly decided that the probative value of Appellant's statement was not substantially outweighed by the danger of unfair prejudice. We overrule Appellant's fourth point.

In his fifth point, Appellant contends that the trial court erred by denying his motion for mistrial when the prosecutor commented that a composite sketch looked like Appellant to him. At trial, Appellant objected that the argument was "outside the record" and "improper." Appellant argues on appeal that the argument was improper because it stated the prosecutor's personal opinion and because the prosecutor was not subject to direct or cross-examination. The trial court sustained his objection, instructed the jury to disregard the improper argument, and denied Appellant's motion for mistrial.

When a trial court sustains an objection and instructs the jury to disregard but denies a defendant's motion for a mistrial, the issue is whether the trial court abused its discretion in denying the mistrial.[15] Only in extreme circumstances, when the prejudice caused by the improper argument is incurable, that is, "so prejudicial that expenditure of further time and expense would be wasteful and futile," will a mistrial

---

[15] *Hawkins v. State*, 135 S.W.3d 72, 76–77 (Tex. Crim. App. 2004).

13

be required.[16]  In determining whether a trial court abused its discretion in denying a mistrial, we balance three factors:  (1) the severity of the misconduct (prejudicial effect), (2) curative measures, and (3) the certainty of conviction absent the misconduct.[17]  Given the trial court's prompt instruction to disregard the prosecutor's comment, Appellant's confession, and the ballistics match between his .22 and the bullet taken from Antonio Marin's body, we cannot conclude that the trial court abused its discretion by denying a mistrial.  We overrule Appellant's fifth point.

## Conclusion

Having overruled Appellant's five points, we affirm the trial court's judgment.


LEE ANN DAUPHINOT
JUSTICE

PANEL:  DAUPHINOT, GARDNER, and WALKER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  March 11, 2010

---

[16] *Id.; see also Simpson v. State,* 119 S.W.3d 262, 272 (Tex. Crim. App. 2003), *cert. denied,* 542 U.S. 905 (2004).

[17] *Hawkins,* 135 S.W.3d at 77; *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999).